MARION F. EDWARDS, Chief Judge.
12Defendant/appellant, Kevin Besse (“Besse”), appeals his conviction of two counts of criminal activity, as well as his adjudication and sentence as a fourth felony offender.
Besse was charged with two counts of home invasion in violation of La. R.S. 14:62.8. Besse entered a plea of not guilty at the arraignment. Afterward, the State amended the bill of information to change the offenses charged to two counts of unauthorized entry of an inhabited dwelling in violation of La. R.S. 14:62.3. The matter was tried before a six-person jury, and Besse was found guilty of criminal trespass on Count 1 and guilty as charged on Count 2. The trial court sentenced Besse to thirty days in parish prison on Count 1 and to imprisonment at hard labor for six years on Count 2. The sentences were made to run concurrently.
^Subsequently, the State filed a multiple offender bill of information alleging that Besse was a fourth felony offender. Besse denied the allegations in the multiple bill. After a hearing on the matter, the trial court found Besse to be a fourth felony offender as charged. The court vacated the “previous sentence” and imposed an enhanced sentence of thirty years at hard labor without benefit of probation or suspension of sentence. A timely appeal motion was granted by the trial court.

FACTS

Anastasia Rey (“Rey”), William James (“James”), and Besse met each other while they were patients at River Oaks Hospital undergoing substance abuse treatment. When Rey, age 29, and James, an elderly gentleman, were released from River Oaks, they decided to rent a duplex together at 546 Orion in Jefferson Parish. Besse was released shortly thereafter and contacted Rey. He and Rey had a brief romantic relationship. During that time, Besse stayed with Rey overnight at her house on Orion, but he never moved into that house. Rey testified that she did not like Besse’s possessive and controlling behavior, so she ended their relationship and asked Besse to leave the house.
Besse refused to leave the home, so Rey left with James and instructed Besse to get his clothing and other belongings and leave her house by the time she returned. Rey and James left and drove around the neighborhood. They both agreed that Besse was “shady” and should not be in *261 their house. While they were talking, Rey noticed that James’ cell phone was on and that Besse was listening to everything they were saying.
Rey and James went to a bar near their house called “Mama’s Place” to give Besse time to leave the house. While she was playing video poker, James was sitting next to her drinking. At some point, Besse walked into the bar and punched 14James in the face. The bartender told Besse to leave, which he ultimately did, and the bartender called the police.
When Deputy Jason Melito of the Jefferson Parish Sheriffs Office arrived, he asked James if he wanted to press charges, but James declined to do so. At that point, Besse called Rey’s cell phone. Deputy Melito got on the cell phone and told Besse that Rey did not want anything to do with him, and if Besse was found at her house, he would go to jail.
After the officer left, Rey and James went home. James, who was drunk, stayed outside in the car and smoked cigarettes. Rey walked inside the house to change clothes.[1] She went into her bedroom, turned on the television, and sat on the futon to watch it. Suddenly, Rey saw Besse standing in the doorway. Besse told Rey she was going to talk to him now. Rey “freaked out” and tried to go to the door, but, when she reached for it, Besse grabbed her and started wrestling with her. Besse was choking her, and they struggled all the way to the front room. Besse had his arm around her throat starting to cut off the air.
Rey said to Besse, “You’re going to kill me,” and he replied, “Yeah, Pm going to f. ..eking kill you.” She kept trying to open the [front] door with her arms and legs, because she thought Besse would kill her if the door closed. Rey, who was screaming, was able to get out of the house. She opened the passenger side door of her car and screamed for James to help her; however, James was “out of it.” At that point, Besse jumped in the front seat, and Rey took off running. Her cell phone was not working so she ran to Mama’s Place and asked the bartender to call the police, which she did.
IsRey was shaken up, her shirt was ripped, she was barefoot, and her pants were covered in grass. She was sore all over her body, and she had fingerprints around her neck and a bruise on her leg. Deputy Melito responded to the call at Mama’s Place, and he and Rey drove back to the house.
Other officers, who were already there, had searched the interior of the house, but they could not find anyone there. At that time, Rey told the officers to check the passenger side door of her car for James. They found James slumped over and unconscious. His face was beaten and “unrecognizable.” He had a severe laceration to his right eye, and severe swelling to his face and left eye. An ambulance was called, and James was taken to the hospital.
Meanwhile, Rey followed the detective in her car to the bureau and gave a statement. Afterward, Rey went back home. At Deputy Melito’s suggestion, Rey called 911 to ask them to send an officer to her house to walk through it with her before she entered the house. While Rey was waiting for the officer to arrive, she no *262 ticed that Besse had sent her several text messages, which were: (1) “I was not going to hurt you. I do love you. Sorry. I just want to talk and be friends;” (2) “From Kevin, James attacked me in the car;” (3) “Please call me!;” (4) “Do you know he was drinking? I bet not;” and (5) “I will not ever hurt you, and I did not. I just want to talk. Please forgive me.”
Deputy Carey Dials eventually arrived at the house, and Rey showed her the text messages from Besse. Afterward, Rey and Deputy Dials went inside the house. Rey went into a spare room and opened the closet. When she did so, the equipment began moving and Besse jumped out. Rey screamed, alerting Deputy Dials who came in and handcuffed Besse. Besse identified himself to the officer as “Steven.” The deputies noticed that Besse had a severe laceration on the knuckle of his right hand. When Deputy Melito asked Besse for his address, Besse |fisaid he had lived at the Orion house for a week, but his current address where he had lived for the longest time was 2429 Idaho Street in Kenner.
Besse testified that, when he was released from River Oaks, he and Rey began living together on Lake Avenue for a couple of weeks, but they were trying to find a larger place for him, Rey, and James to live. Besse explained that he was not involved in getting the house on Orion and that house was “strictly” Rey and James’, and he did not want “any part of that.” Besse claimed that Rey did not feel comfortable with James, and she would not move into the Orion house unless Besse moved in with them, so he did.
Besse asserted that James rented the Orion house, that Besse and Rey moved into that house together, and that the three of them lived there for approximately two or three weeks. He claimed that he gave Rey $300 for rent. Besse admitted he got into a conflict with James one time that night at Mama’s Place and slapped him on the side of the face because James allegedly gave Rey $900, and Besse was concerned Rey would use that money for drugs. He denied punching James at Mama’s Place.
Besse testified that the three of them “relapsed” on the day in question and that led to problems and a big fight. He denied talking to a deputy on the cell phone. After Besse left Mama’s Place, he went home to the Orion house. Rey came in, and Besse said he needed to talk to her about James’ drinking. Besse denied that he and Rey had a physical conflict. He testified that he just wanted to talk to Rey, but she would not talk to him, so he grabbed her arm when she tried to go out the door. Besse explained that he was not trying to hurt her, but trying to get her attention. He denied that Rey asked him to leave and not come back.
Besse admitted texting Rey a few times that night. He explained that he was in the closet because Rey had him sleep there when he snored since they had no 17furniture other than her futon and the bed Besse gave to James. He tried to tell the deputy why he was in the closet and that he lived in the Orion house, but the deputy kept telling him to “shut his mouth.” Besse denied causing the injuries to James’ face, and he suggested that James might have sustained those injuries by falling down while he was drunk. He stated that James needed a cane, but did not have it that night. Besse explained that the injury to his knuckle occurred when he broke a beer bottle at the bar and tried to pick it up. He also explained that he was being sarcastic when he told the officer his name was “Steven,” as Rey knew who he was.
Besse testified that he did not sign a lease or a sublease, but he had a verbal *263 contract to stay at the Orion house. He admitted that he had prior convictions and that he had pled guilty to second degree battery, cruelty to the infirmed, battery, violating a protective order, worthless checks, and shoplifting.

LAW AND ANALYSIS

In a pro se brief to this Court, Besse assigns two errors for our review. In the first, Besse argues that the evidence was insufficient to prove that he committed unauthorized entry of an inhabited dwelling.[2] He contends that he did not have the specific intent to enter the residence because he was already in the residence and never left it on the day in question. Besse further contends that the State failed to exclude every reasonable hypothesis of innocence because the State did not sufficiently prove that he did not pay rent and that he and Rey were not living together. He asserts that the State did not prove that James, the lessee, had |8not given him authorization to live at the Orion residence. Besse further asserts that, because Rey did not own or lease the residence, she could not give authorization for anyone to occupy the home in which they all lived.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[3]
In cases involving circumstantial evidence, the trial court must instruct the jury that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”[4] The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[5]
Besse was charged with two counts of unauthorized entry of an inhabited dwelling. He was convicted of the lesser included offense of criminal trespass on the first count and guilty as charged on the second count. He does not challenge the sufficiency of the evidence with respect to his criminal trespass conviction.
Unauthorized entry of an inhabited dwelling is defined by La. R.S. 14:62.3(A) as the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person. *264 An unauthorized entry is an entry |9without consent, express or implied.[6] In the case of a private residence, a person must have the consent of the occupant or an occupant’s agent to constitute a defense to unauthorized entry.[7] Unauthorized entry of an inhabited dwelling requires general intent.[8] General criminal intent is present when the circumstances indicate that the offender “in the ordinary course of human experience must have adverted to the prescribed criminal consequences as reasonably certain to result from his act.”[9]
At trial, the jury apparently found the State’s witnesses to be more credible than Besse. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal.[10]
Upon review, we find the evidence, as accepted by the jury, shows that Besse entered Rey’s residence without authorization. Rey clearly told Besse that she wanted him to leave the house and take his belongings with him. The officer also told Besse on the phone that Rey did not want anything to do with him and that he should not go back to Rey’s house. Nevertheless, Besse returned and entered the house thereafter on two occasions without permission. Accordingly, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support his conviction for unauthorized entry of an inhabited dwelling. This assignment is without merit.
In his second assignment of error, Besse argues the trial court erred in admitting evidence of other crimes. Specifically, Besse’s argument is that photos |10of injuries sustained by James on the day of the incident were only meant to inflame the jury and were more prejudicial than probative.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial.[11] However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule.[12]
Evidence that constitutes an integral part of the crime, formerly known as “res gestae,” is admissible without any prior notice to the defense.[13] A close con-nexity is required between the charged and uncharged conduct to assure that the purpose served by admission of the other crimes evidence is to complete the story of the crime on trial by proving its immediate context of happenings near in time and place, rather than to depict the defendant as a bad man.[14] Evidence constituting an integral part of the crime includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and *265 police officers pertaining to what they heard or observed before, during, or after the commission of the crime, provided a continuous chain of events is evident under the circumstances.[15] As recognized by this Court,
The test for integral act (res gestae) evidence is, therefore, not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive the State’s case of narrative momentum and cohesiveness, “‘with power not only to support conclusions but to |nsustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ”[16]
The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence.[17] Clearly, evidence of other crimes or bad acts is prejudicial since all evidence which tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. The underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime.[18] Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence will not be disturbed.[19]
After some discussion, the trial court allowed the officer to testify to the physical condition in which James was found during the investigation of the crime. The trial court also allowed certain photos of James to be shown to the jury.
Defense counsel argued that the photographs showed a crime not included in the crimes charged. The prosecutor responded that this evidence was “res gestae,” as it occurred during the middle of the home invasion, and it was a single course of criminal conduct. The trial judge asked to see the photograph before it was admitted. She said she would have to determine whether the probative value outweighed the prejudice. The prosecutor commented that the photographs were highly probative of authorization, that he had already informed the jury they were going to see the photographs, and that there was no objection by the court or the defense at that time. After hearing arguments of counsel, the trial judge ruled that |12the photographs supported the credibility of the police officer as to what he observed, and she allowed them to be admitted.
Deputy Melito then testified at trial that State’s Exhibits 1 through 4 depicted James and the injuries he observed on James when he saw James in the car. Deputy Melito explained that the photographs showed a severe laceration to the right eye and severe swelling to James’ face and left eye. He further explained that James was going in and out of consciousness, and he dispatched for medical and crime scene technicians to come out.
*266 We find the trial court correctly admitted the evidence under the “res ges-tae” or integral act evidence rule since the attacks on James occurred during one continuous chain of events that night. The testimony indicates that Besse punched James in the face at the bar before going back to the house the first time and that Besse got into the car with James and severely beat him after Besse tried to strangle Rey, but before Besse re-entered the house a second time. There was a close connexity between the charged and uncharged conduct, which assured that the purpose served by admission of the evidence in question was to complete the story of the crime on trial by proving its immediate context of happenings near in time and place, rather than to depict the defendant as a bad man.
This assignment is meritless.
Besse also assigns two errors through appellate counsel. In the first, he asserts the trial court erred in adjudicating him as a fourth felony offender. We find merit in this assignment.
To prove a defendant is a habitual offender, the State must initially prove the prior felony convictions and that the defendant is the same person who was | ]¡¡convicted of the prior felonies.[20] The latter can be established through the use of expert testimony that the defendant’s fingerprints match those from the prior convictions.[21]
This Court has found sufficient linkage where the State connects the fingerprint card to the arrest register and/or the bill of information by matching police item numbers, Bureau of Identification numbers, social security numbers, addresses, employers, or docket numbers.[22] Identification of the accused may also be by testimony of witnesses or by photographs contained in the duly authenticated record[23]
When the State relies on a prior conviction that is based on a guilty plea to prove the defendant’s habitual offender status and the defendant denies the habitual offender bill, the State’s burden of proof is governed by State v. Shelton,[24] Under Shelton, it is initially the State’s burden to prove: 1) the existence of the prior guilty pleas; and 2) that the defendant was represented by counsel when the pleas were taken. If the State satisfies that burden, the burden shifts to the defendant to produce affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant makes such a showing, the burden of proving the constitutionality of the plea shifts to the State. This burden is met if the State produces a “perfect” transcript of the guilty plea, i.e., one which reflects a colloquy in which the judge informed the defendant of, and the defendant waived his right to trial by jury, his privilege against self-incrimination, and his right of confrontation.[25]
114If the State introduces anything less than a “perfect” transcript, such as a guilty plea form, a minute entry, an “imperfect” transcript, or any combination thereof, the judge must weigh the evidence *267 submitted by each party to determine whether the State has met its burden of proving the prior guilty plea was “informed and voluntary, and made with an articulated waiver of the three Boykin[26] rights.”[27]
On September 24, 2010, the State filed a multiple bill alleging that Besse was a fourth felony offender with the following prior convictions: (1) guilty plea on December 4, 2008, to a violation of La. R.S. 14:71 (issuing worthless checks) in case number 07-1109 in the Twenty-Fourth Judicial District Court; (2) guilty plea on March 20, 2002, to a violation of La. R.S. 14:34.1 (second degree battery) in ease number 00-6451 in the Twenty-Fourth Judicial District Court; (B) guilty plea on April 14, 1999, to a violation of La. R.S. 14:67.10 (theft of goods) in case number 98-363 in the Twenty-Fourth Judicial District Court; and (4) guilty plea on July 17, 1997, to a violation of La. R.S. 14:93.3 (cruelty to the infirmed) in case number 95-4526 in the Twenty-Fourth Judicial District Court.
Besse denied the allegations in the multiple bill.
At the multiple bill hearing, Deputy Chris Jones of the Jefferson Parish Sheriffs Office testified that he was the bailiff in Division “K” on September 14, 2010, and he was present during the jury trial in the instant case when Besse admitted to having convictions for second degree battery, cruelty to the infirmed, simple battery, violating a protective order, issuing worthless checks, and shoplifting. He identified State’s Exhibit 1 as an accurate transcript of those proceedings. The State also introduced at that hearing copies of Besse’s prior convictions, State’s Exhibits two through five, which corresponded to the case numbers contained in the multiple bill.
| ir,State’s Exhibit 2 contained a bill of information, fingerprint card, guilty plea form, and minute entry in case number 07-1109; State’s Exhibit 3 contained a bill of information, multiple bill, minute entry, and guilty plea form in case number GO-6451; State’s Exhibit 4 contained a bill of information, fingerprint card, multiple offender guilty plea form, multiple bill, guilty plea form, and minute entry in case number 98-363; and State’s Exhibit 5 contained a bill of information, fingerprint card, guilty plea form, and minute entry in case number 95-4526.
Following Deputy Jones’ testimony, the prosecutor argued that Besse admitted during cross-examination that he had numerous felony convictions which corresponded with the certified convictions he had provided to the court. Afterward, the trial judge stated that she was present during Besse’s testimony and that the certified convictions were in order. Accordingly, the trial judge found that Besse “was a multiple offender within the meaning of the multiple offender statute.”
Defense counsel responded that the State did not prove its case beyond a reasonable doubt, arguing that it called no witnesses to prove through fingerprint evidence or other evidence that Besse was the same individual convicted in those previous cases. Defense counsel also argued that the State had not shown any dates on which the convictions occurred.
The prosecutor replied that fingerprint evidence was only one way to convict. The trial judge stated that “it is corroborated by the certified convictions and by the testimony of the defendant himself during *268 his most recent trial.” She again found that Besse was a “multiple offender within the meaning of the multiple offender statute.” Defense counsel noted his objection.
After reviewing the foregoing, we find that the State did not meet its burden in establishing that Besse was the same person convicted of the prior felonies listed |t(iin the multiple bill. The State did not call a fingerprint expert to link Besse’s fingerprints to those found in the prior convictions. Rather, the State used Besse’s trial testimony and copies of his prior convictions to prove that he was a multiple offender. Besse admitted at trial that he had prior felony convictions for second degree battery, cruelty to the in-firmed, issuing worthless checks, and theft of goods, which were the same offenses listed in the multiple bill. However, Besse did not provide the dates on which those offenses occurred, or the corresponding case numbers for those offenses, and he did not identify State’s Exhibits 2 through 5 as his prior convictions.
Additionally, Besse denied at trial that his date of birth was September 16, 1966, which was the date of birth on the bills of information and given by Besse at the time he pled guilty in State’s Exhibits 3 and 4.[28] He did not testify as to his correct date of birth at trial; however, the bill of information in the instant matter lists his date of birth as September 26,1966.
Although Besse’s name is on the prior convictions, the Louisiana Supreme Court has found that that is insufficient evidence of identity.[29] We find on this record that the State failed to meet its burden of proving that Besse was a multiple offender; accordingly, we reverse the multiple offender adjudication and vacate the enhanced sentence.
The final assignment of error is that the enhanced sentence is excessive. Because we have vacated that sentence, the issue of excessiveness is now moot.
We have reviewed the record on its face for errors patent. We find that Besse was not re-arraigned after the bill of information was amended to change the | t7charges against him. However, the failure to re-arraign a defendant on an amended charge is waived if the defendant enters the trial without objecting to the omission.[30]
We also find several errors that relate to the adjudication of Besse as a multiple offender and the enhanced sentence. We note that the trial court merely found Besse to be a multiple offender, without a finding of whether he was a second, third or fourth offender.
We also note that the transcript of the enhanced sentencing reflects that the trial judge vacated the “previous sentence” before imposing the enhanced sentence. She did not specify whether the sentence vacated was on Count 1 or Count 2. However, the commitment shows that the trial judge vacated the sentence on Count 2. When there is a conflict between the transcript and the commitment, the transcript prevails.[31]
*269 Since by this opinion we vacate both the multiple offender adjudication and the enhanced sentence, discussion of those errors is unnecessary. However, in the event the State files a second multiple bill of information, the trial judge is instructed to be specific as to the findings in the adjudication and the sentence being vacated.[32]
For the reasons set forth in this opinion, we affirm the convictions of unauthorized entry of an inhabited dwelling and criminal trespass. We vacate the | ^multiple bill adjudication and the enhanced sentence. Further, we hereby reinstate the original sentences on Count 1 and Count 2.

AFFIRMED IN PART; REVERSED IN PART; MULTIPLE OFFENDER ADJUDICATION VACATED; ENHANCED SENTENCE VACATED; ORIGINAL SENTENCES AFFIRMED AND REINSTATED; MATTER REMANDED

. Rey testified that, prior to December 1, 2009, she and James had keys to the house, but Besse did not. She further testified that, on the date in question, she did not have her keys because a person upstairs had taken her keys or she had lost them. Therefore, for "those couple of days,” they were using the front window or the back door to get into the house.

.When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, the sufficiency of the evidence is addressed first.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. La. R.S. 15:438.

. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83.

. State v. Rivet, 01-353 (La.App. 5 Cir. 9/25/01), 798 So.2d 219, 224.

. Id.

. State ex rel. D.J., 00-1592 (La.App. 5 Cir. 3/28/01), 783 So.2d 558, 561.

. La. R.S. 14:10(2).

. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

. La. C.E. art. 404(B)(1); State v. Prieur, 277 So.2d 126, 128 (La.1973).

. State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165.

. State v. Charles, 00-1586 (La.App. 5 Cir. 6/27/01), 790 So.2d 705, 708.

. Id.

. State v. Bennett, 10-393, p. 7 (La.App. 5 Cir. 3/29/11), 63 So.3d 251, 257.

. State v. Rhea, 03-1273 (La.App. 5 Cir. 2/23/04), 868 So.2d 863, 867 (citing State v. Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074, 1076 (quoting Old Chief v. United States, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997))).

. State v. Dauzart, 02-1187, (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165-66.

. State v. Williams, 02-645 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.

. State v. Merritt, 04-204 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.

. State v. Thomas, 06-654 (La.App. 5 Cir. 1/16/07), 951 So.2d 372, 378, writ denied, 07-464 (La.11/21/07), 967 So.2d 1153.

. Id.

. State v. Muhammad, 03-419 (La.App. 5 Cir. 6/29/04), 880 So.2d 29, 33, writ denied, 04-2082 (La.1/7/05), 891 So.2d 669.

. State v. Curtis, 338 So.2d 662, 664 (La.1976).

. 621 So.2d 769, 779-80 (La.1993).

. Id.

. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

. Shelton, 621 So.2d at 780.

.It is noted that, in State's Exhibit 5, defendant reported his date of birth as September 26, 1966 at the time of his guilty plea, but the bill of information showed a date of birth of September 16, 1966. In State’s Exhibit 2, Besse reported his date of birth as September 26, 1966 at the time of his guilty plea, and the bill of information showed a date of birth of September 26, 1966.

. State v. Curtis, 338 So.2d at 664.

. La.C.Cr.P. art. 555; State v. Narcisse, 01-49 (La.App. 5 Cir. 6/27/01), 791 So.2d 149, 152, writ denied, 01-2231 (La.6/14/02), 817 So.2d 1152.

. State v. Lynch, 441 So.2d 732 (La.1983).

. Since double jeopardy principles are inapplicable to sentence enhancement proceedings, the State may retry Besse as a multiple offender. State v. Raymond, 98-119 (La.App. 5 Cir. 8/25/98), 718 So.2d 1010, 1014.