WICKER, J.
*901 Defendant, Carlos Alberto Montero, Sr., appeals his convictions and sentences for failure to maintain registration as a sex offender, two counts of indecent behavior with a juvenile under the age of thirteen, two counts of aggravated rape, and sexual battery of a juvenile under the age of thirteen. For the following reasons, we affirm defendant's convictions and sentences but remand the matter to the trial court for correction of errors patent.
STATEMENT OF THE CASE
On April 28, 2016, a Jefferson Parish Grand Jury indicted defendant with failing to maintain registration as a sex offender by failing to make his community notification in violation of La. R.S. 15:542 (count one); indecent behavior with a known juvenile (DOB 12/28/95), wherein the victim was under the age of thirteen, in violation of La. R.S. 14:81 (count two); aggravated rape upon a known juvenile (DOB 10/11/99) in violation of La. R.S. 14:42 (count three); aggravated rape upon a known juvenile (DOB 11/30/00) in violation of La. R.S. 14:42 (count four); sexual battery upon a known juvenile (DOB 11/30/00), wherein the victim was under the age of thirteen, in violation of La. R.S. 14:43.1 (count five); and indecent behavior with a juvenile (DOB 11/30/00), wherein the victim was under the age of thirteen, in violation of La. R.S. 14:81 (count six). At his arraignment, defendant pled not guilty.[1]
On April 13, 2017, the State filed a Notice of Intent to Introduce Evidence of Other and Similar Crimes, Wrongs and/or Acts Pursuant to Louisiana Code of Evidence Articles 404(B) and 412.2, that was granted on April 20, 2017.[2] On November 13, 2017, the State amended count one of the indictment to reflect that defendant had previously been convicted of carnal knowledge of a juvenile in violation of La. R.S. 14:80, in case number 02-4098 in the 24th Judicial District Court on September 16, 2002.
On November 14, 15, and 16, 2017, the case was tried before a twelve-person jury that unanimously found defendant guilty as charged on all counts. On January 8, 2018, defendant filed a Motion for Post-Verdict Judgment of Acquittal, a Motion in Arrest of Judgment, and a Motion for A New Trial, which the trial judge denied. Thereafter, defendant waived sentencing delays and the trial court sentenced him to imprisonment at hard labor for ten years *902 without benefit of probation, parole, or suspension of sentence for his conviction for failing to maintain his sex offender registration (count one); imprisonment at hard labor for seven years for each of his indecent behavior with a juvenile under the age of 13 convictions (counts two and six); life imprisonment without benefit of probation, parole, or suspension of sentence for his aggravated rape convictions (counts three and four); and imprisonment at hard labor for ten years without benefit of probation, parole, or suspension of sentence for his sexual battery of a known juvenile under the age of thirteen conviction (count five). The trial judge ordered the sentences to run concurrently with each other.[3] This timely appeal followed.
FACTS
Carlos Montero, Jr., defendant's son, testified that he was living with his fiancée, M.L., and her four children (her oldest son, D.S.; her oldest daughter, T.S.; her youngest son, K.L., and her youngest daughter, V.L.) as a family since early 2006 at 1904 Kentucky Avenue in Kenner.[4] Although Mr. Montero and M.L. are not married, M.L.'s children refer to him as their stepdad or stepfather and he is a father-figure to M.L.'s children. Mr. Montero further testified that he allowed his father, defendant, to move into their home in May of 2006. Mr. Montero acknowledges that he knew that his father had been previously convicted of carnal knowledge of a juvenile in 2002, but pointed out that defendant served his time for that crime and he desired to reconnect with his father.
Mr. Montero asserted that defendant moved out of the Kentucky Avenue residence at the beginning of 2007, moved back in after August of 2007 to an apartment behind the house, moved out in 2011, and moved back in again in October of 2015. Mr. Montero acknowledged that he and M.L. argued because M.L. did not want defendant living there; however, he insisted that defendant stay.
Mr. Montero testified that on January 8, 2016, he found a letter dated "November 12" in V.L.'s bedroom that was written by V.L. to her deceased father. In the letter, V.L. talked about her mother and Mr. Montero arguing, after which she said:
And I'm pretty sure you know about his dad. I'm also pretty sure you know what he did to me. I want to say I'm sorry I haven't told ma. I just don't her [sic] to be heartbroken. I know that she got raped when she was in her teens. So if I told her this, think about how she'll react. I'll feel horrible.
Mr. Montero stated that after he read the letter, he immediately texted V.L. and checked her out of school. He asked her about the letter and she disclosed to him that defendant had been sexually abusing her. Mr. Montero maintained that he did not immediately call the police as V.L. asked him not to tell anyone. He testified that he talked to T.L. and K.L. that night and that they told him about "stuff" that defendant had done to them also. He acknowledged that he and his brother were at the house for several days afterwards planning to kill defendant when Mr. Montero realized that was not the best course of action. Mr. Montero then contacted Kenner police and he and his family went to City Hall to report the sexual abuse. He explained that he did not report it from his home because he knew defendant "would run." Mr. Montero testified *903 that he made a report and gave a statement.
Officer Brian Saucier of the Kenner Police Department testified that on January 12, 2016, he was dispatched to 1801 Williams Boulevard where Kenner City Hall is located and met with Mr. Montero and his family, who informed him that defendant had been sexually abusing three of M.L.'s children. Officer Saucier further testified that he later met with Detective Peter Foltz who became the lead detective, and proceeded to 1904 Kentucky Avenue to apprehend defendant.
Detective Foltz testified that in January of 2016, he met with Mr. Montero and his family, interviewed the children separately, and took a recorded statement from T.S., who was an adult at that time. Detective Foltz subsequently referred K.L. and V.L. to the Jefferson Children's Advocacy Center (CAC) where forensic interviews were conducted and videotaped. Detective Foltz testified that Mr. Montero informed him that he believed there were other family members whom defendant had sexually abused. Detective Foltz testified that Kelly Holder, one of those family members, later contacted him and disclosed allegations of sexual abuse by defendant from the 1980s.[5]
T.S., age twenty-one at the time of trial, testified that she lived in Kenner with Mr. Montero, her mother, and her siblings, K.L., V.L., and D.S. She also testified that defendant moved into the house with them in 2006 or 2007, when she was about eleven or twelve years old and in the seventh grade. She explained that when defendant first moved in, he did not act inappropriately but that his behavior started to change in a way that made her feel uncomfortable.
T.S. also testified that in the early morning, before she would go to school, there were times when defendant would come and lie in bed with her, rub her hair, caress her, and try to kiss her neck to wake her up. T.S. remembered defendant climbing in bed with her and kissing her on the lips to wake her up in a sexual way. T.S. testified that on one occasion, when she was twelve or thirteen, defendant was kissing her on her neck, and when she asked him why he was doing that, defendant replied that he knew it gave her "goosebumps." She thought that occurred within a few months of defendant moving in. T.S. testified that after the "goosebump" situation, she told defendant something that made him stop, and the abuse stopped.
T.S. asserted that she did not tell anyone because the abuse had stopped and she knew Mr. Montero, her "stepdad," was happy to have his father back in his life and was trying to build a relationship with him, which she did not want to ruin. She testified that she regrets her decision not to tell anyone at the time it occurred.
K.L. testified that his date of birth is October 11, 1999, and that his siblings are D.S., T.S., and V.L. He also testified that defendant came to live with him and his family at 1904 Kentucky in 2006. K.L. remembered that when he was six or seven years old, he went into defendant's bedroom to watch a movie. While doing so, he fell asleep at the bottom of defendant's bed. K.L. testified that when he woke up, defendant's mouth was on his penis and defendant was performing "oral" on him. K.L. asserted that he had no idea what was going on at the time and that he went back to sleep. He stated that after he woke up again, he went to D.S.'s room and told D.S. and T.S. what happened but that they *904 did not believe him. K.L. testified that a couple of years later, he told his grandmother, the first adult whom he told what defendant had done to him. He explained that a couple of days after that, his aunt asked him if it actually happened. K.L. told her it had, but she did not believe him. K.L. explained that his family kept asking, but maintained that he was lying. K.L. testified that he finally just told his grandmother and aunt that it was a nightmare because he did not like the confrontations. K.L. asserted that he never brought it up again until the instant case.
V.L. testified that her date of birth is November 30, 2000, and that she lives at 1904 Kentucky Street with her mother, M.L., her "stepdad," Mr. Montero, and her siblings, D.S., K.L., and T.S. She explained that defendant, Mr. Montero's father, came to live with them when she was approximately five or six years old. She recalled that the abuse did not start immediately after he moved in. V.L. asserted that when defendant came to live there, she was still sharing a room with her sister; however, she got her own room around August 2007, when her older brother turned thirteen years old. She stated that defendant sexually abused her but that she did not recall the first time. V.L. recalled that defendant kept looking at her "up and down." She testified that defendant abused her after he moved back into the house in 2007 when she had her own room.
V.L. testified that one night, defendant came in, lay down with her, and put his fingers on her vagina. She did not know how old she was when that occurred. V.L. further testified that some nights, defendant came into her room and "would give" her oral sex, which she described as defendant putting his tongue in and on top of her vagina. She also asserted that defendant put his penis into her vagina. V.L. remembered that one night, defendant had some of his penis inside of her vagina but that "he wasn't fully penetrated." She recalled that it hurt. V.L. testified that defendant put a condom on his penis. She stated that she was approximately seven to nine years old when these incidents occurred.
V.L. maintained that the abuse stopped when defendant moved out of the house in 2011. She asserted that the abuse occurred often, "five out of seven days." V.L. remembered that defendant would go offshore for work and not be home for an extended period of time. She stated that defendant left a vibrator for her in the "back house" in their backyard and told her that she could use it whenever she wanted to. V.L. indicated that she never used it. V.L. testified that the abuse happened at night when everybody was asleep; however, she recalled one time that it occurred during the day. She explained that one time, when she was in the fourth grade and was "nine turning ten," she was checked out of school and went home because defendant was painting her room. She stated that nobody was home except her and defendant and that he was "trying to give" her oral sex. She stated that while defendant was performing oral sex on her that time, she heard K.L. come in, so she told defendant to stop, which he did. V.L. asserted that although defendant stopped that time, he performed oral sex on her many times, "maybe" more than fifty times. V.L. recalled that when defendant was performing oral sex on her she would tell him to stop, but he would not. She stated that defendant did not threaten her but that he would pull her hair when she was with her male cousins or playing around with her brothers. V.L. testified that when she was a kid, defendant used to give her candy and told her not to tell anyone. She said that up until 2011 when defendant moved out, she never told anyone *905 about the sexual abuse as she felt physically intimidated by him and was scared of him.
V.L. also testified that defendant showed her pornography. She recalled that one time she was watching the Disney Channel, and defendant came in, changed the channel, and put pornography on. V.L. described it as a man and a woman having sex on television. She recalled that defendant said that he was glad he could show it to her because she was "mature." V.L. indicated that the sexual abuse occurred from the time she was approximately six years old until she was approximately eleven years old. She asserted that when it started, she did not know what was happening and that when it stopped, she got the sense that it was wrong.
V.L. also recalled that defendant masturbated in front of her more than one time. She explained that defendant would grab her hand, place it on his penis, and put his hand on top of hers until something would come out of defendant's penis. V.L. recalled when her "stepdad," Mr. Montero, checked her out of school and asked her about a letter she had written about the sexual abuse. She asserted that she told Mr. Montero everything that had been happening for years and that she asked him not to tell anyone.
K.H., defendant's niece, testified that in 2016, Mr. Montero, her cousin, contacted her and asked her about any other sexual abuse by defendant. K.H. asserted that in 2016, she called a Kenner detective and gave a statement over the phone that she was the victim of prior sexual abuse by defendant. She stated that the abuse began on her fifth birthday in 1982. K.H. recalled that defendant came home that day wearing his military suit, that he gave her a teddy bear, and that she was excited to see him as they shared the same birthday. She stated that her parents were divorced and that defendant babysat her and her sister while her mother went to work nights in a bar. K.H. explained that defendant got drunk that night and that after her mother went to work, defendant came up the steps and started "oral molesting" her. She testified that defendant also similarly orally molested her sister in the upstairs bedroom that they shared.
K.H. maintained that defendant molested her orally at first, explaining that he went between her legs with his face and put his mouth and tongue on her vagina. She testified that she witnessed defendant do the same thing to her sister at night. K.H. asserted that she could not tell her mother because defendant threatened her and her sister that he would hurt their mother. She recalled that she was eight or nine when she told her mother's boyfriend about the abuse. K.H. said that she told him not to say anything but that the boyfriend told her mother. After that, her mother tried to keep them away from defendant. K.H. testified that the abuse happened from the ages of five to seven when her mother was working and that the abuse happened "weekly." She stated that when she called the police to find out where defendant lived, sometime during 2011 or 2012, she told a police officer over the phone that defendant had abused her but no report was prepared and nothing ever happened.
Erika Dupepe testified that she is employed by the District Attorney's Office and assigned to the Jefferson CAC. She further testified that she conducted forensic interviews with K.L. and V.L. separately on January 25, 2016, which were recorded and played for the jury. The interviews of K.L. and V.L. provided accounts of the sexual abuse by defendant similar to their trial testimony.
Dr. Jamie Jackson testified that she is a child abuse pediatrician with the Audrey *906 Hepburn Care Center through Children's Hospital. The State and the defense stipulated that she was qualified as an expert in the field of child abuse pediatrics. Dr. Jackson stated that in February of 2016, she examined K.L. and V.L. Dr. Jackson explained that most children who are sexually abused do not tell anyone right away and that there were many reasons for delayed disclosure, including naivety, the lack of realization that the abuse is wrong, embarrassment, shame, fear, guilt, threats, or the fact that most of the time the perpetrator is someone who has access to the child who the child loves or trusts. She also explained that disclosure is a process with the child, who may reveal a little at a time. Dr. Jackson maintained that K.L. and V.L. provided a clear history of child sexual abuse.
Sergeant Patrick Smith of the Jefferson Parish Sheriff's Office (JPSO) testified that he was commander of the fingerprint identification records section and the sex offender registry. He further testified that defendant is required to register as a sex offender because he had been previously convicted of a sex crime, felony carnal knowledge of a juvenile. Sergeant Smith noted that defendant was required to register as a "tier one" offender for fifteen years from the date of release from incarceration, which was 2006. He asserted that in 2015 and 2016, defendant was registered at 488 Hamilton Street in Gretna. He maintained that defendant never came into the office in 2015 or 2016 to register a new address, even though defendant was living at 1904 Kentucky Street in Kenner. Sergeant Smith also testified that if an offender owns or operates a vehicle, that vehicle also has to be registered with his office. He identified a copy of defendant's vehicle registration for 2015, which also showed the address of 488 Hamilton Street in Gretna. Sergeant Smith asserted that at no time in 2015 or 2016 did defendant update his vehicle registration to show that he was living in Kenner. He maintained that when defendant was arrested in connection with the instant case, defendant gave his address as 1904 Kentucky Street in Kenner.
At trial, the State and the defense stipulated to State's Exhibit 5, a certified conviction record of defendant, reflecting that defendant was convicted on September 16, 2002, in case number 02-4098 in the 24th Judicial District Court, for carnal knowledge of a juvenile in violation of La. R.S. 14:80, and that defendant, who was born on May 9, 1963, is the same individual who is charged in the instant case with failure to register as a sex offender in count one.
LAW AND ANALYSIS
In his sole assignment of error on appeal, defendant contends that the trial judge erred in allowing evidence of his prior 2002 conviction for carnal knowledge of a juvenile.
On April 13, 2017, the State filed a "Notice of Intent to Introduce Evidence of Other and Similar Crimes, Wrongs, And/Or Acts Pursuant to Louisiana Code of Evidence Articles 404(B) and 412.2," seeking to introduce evidence of defendant's prior 2002 conviction for carnal knowledge of a juvenile in violation of La. R.S. 14:80. In its notice of intent, the State contended that defendant's prior conviction-which reflects that defendant, at 38 to 39 years old, was having consensual sex with a thirteen-year-old female from February to May 2002-is relevant to prove defendant's intent as to his indecent behavior with a juvenile charges, as well as his lustful disposition toward children pursuant to La. C.E. art. 412.2. The trial court conducted a hearing and, on April 20, 2017, the trial judge granted the State's notice of intent to introduce evidence of defendant's 2002 conviction.
*907 In his sole assignment of error, defendant contends that the trial judge erred in allowing the State to introduce evidence of the 2002 conviction for carnal knowledge of a juvenile, asserting that the 2002 crime was irrelevant because it involved consensual sexual intercourse with the minor.
The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because he has committed other such crimes in the past. State v. Williams , 09-48 (La. App. 5 Cir. 10/27/09), 28 So.3d 357, 363, writ denied , 09-2565 (La. 5/7/10), 34 So.3d 860. However, such evidence may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule when it tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character. State v. Greenup , 12-881 (La. App. 5 Cir. 8/27/13), 123 So.3d 768, 772, citing State v. Dauzart , 02-1187 (La. App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
Specifically, in sex abuse cases, the "lustful disposition" exception applies as set forth in La. C.E. art. 412.2, which provides in part:
When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
Accordingly, pursuant to La. C.E. art. 412.2, evidence of a prior sexual offense is admissible to show a defendant's lustful disposition towards children if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. State v. Olivieri , 03-563 (La. App. 5 Cir. 10/28/03), 860 So.2d 207, 218 ; see also La. C.E. art. 403. Article 412.2 was enacted to loosen restrictions on "other crimes" evidence and to allow evidence of "lustful disposition" in cases that involve sexual offenses. Id. at 318. In enacting Article 412.2, "the Legislature did not see fit to impose a restriction requiring such evidence to meet a stringent similarity requirement for admissibility." Id. at 317. Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility of such evidence should not be overturned. State v. J.M. , 14-579 (La. App. 5 Cir. 2/11/15), 189 So.3d 1079, 1089 ; see also State v. Cosey , 97-2020 (La. 11/28/00), 779 So.2d 675, 684, cert. denied , 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001).
Upon review of the entirety of the record in this matter, we find that evidence of defendant's 2002 conviction for carnal knowledge of a juvenile, involving defendant at age 38 and 39 engaging in sexual conduct with a thirteen-year-old girl, is squarely admissible under La. C.E. art. 412.2 to show defendant's lustful disposition toward children. First, evidence of the prior conviction was a necessary element for the State to prove that defendant failed to maintain his registration as a sex offender under La. R.S. 15:542 and, further, the probative value of this other crimes evidence was not substantially outweighed by unfair prejudice, confusion, undue delay, or waste of time. Moreover, the record reflects that the trial judge provided the jury with a limiting instruction at the conclusion of trial. See *908 State v. J.M. , 14-579 (La. App. 5 Cir. 2/11/15), 189 So.3d 1079, 1090. Accordingly, we find that the trial judge did not abuse her discretion in ruling admissible defendant's prior 2002 conviction for carnal knowledge of a juvenile. This assignment is without merit.
ERRORS PATENT
The record was reviewed for errors patent, according to La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5th Cir. 1990). The record reflects the following errors patent:
Re-arraignment
On April 6, 2017, the State amended count one to reflect that defendant failed to maintain his registration as a sex offender by failing to provide his address of residence instead of by failing to make his community notification, and it amended counts three through six to reflect that the offenses occurred on or between January 1, 2006 and December 31, 2011. On November 13, 2017, the State amended count one to add that defendant had previously been convicted of carnal knowledge of a juvenile in violation of La. R.S. 14:80 in case number 02-4098 in the 24th Judicial District Court on September 16, 2002. It does not appear that defendant was re-arraigned after the indictment was amended.
The purpose of an arraignment is to inform the defendant of the substance of the crime he is charged with La. C.Cr.P. art. 551. A re-arraignment is only required after amendment of a bill of information if the substance of the charge is changed. State v. Aulph , 47,966 (La. App. 2 Cir. 5/22/13), 114 So.3d 610, 617 ; see also State v. Tillery , 14-429 (La. App 5 Cir. 12/16/14), 167 So.3d 15, 23-24, writ denied , 15-0106 (La. 11/6/15), 180 So.3d 306. Nevertheless, the failure to rearraign a defendant on an amended charge is waived if the defendant enters the trial without objecting to the omission. State v. Besse , 11-230 (La. App. 5 Cir. 12/28/11), 83 So.3d 257, 268, writ denied , 12-0292 (La. 5/25/12), 90 So.3d 409. In the instant case, it appears that defendant entered the trial without objecting to the omission. Thus, defendant has waived any objection to the trial court's failure to rearraign him on the amended indictment.
Mandatory Fine
The transcript does not reflect that the trial judge imposed the mandatory fine in connection with count one. La. R.S. 15:542.1.4(A)(1) requires a fine of not more than $1,000, for failure to maintain sex offender registration. This Court has held that a statute, providing for a fine of "not more than" a specified amount, does require a mandatory fine. However, this Court has noted that the matter is not free from doubt. See State v. Kerlec , 06-838 (La. App. 5 Cir. 4/11/07), 957 So.2d 810, 815, writ denied , 07-1119 (La. 12/7/07), 969 So.2d 626.
The Louisiana Supreme Court has held that an appellate court has the authority under La. C.Cr.P. art. 882 to correct an illegally lenient sentence at any time, even if the issue of an illegal sentence was not raised by the defendant or the State. State v. Campbell , 08-1226 (La. App. 5 Cir. 5/26/09), 15 So.3d 1076, 1081, writ denied , 09-1385 (La. 2/12/10), 27 So.3d 842.
However, often in indigent defender matters, this Court has decided not to use this authority. Id. In State v. Horton , 09-250 (La. App. 5 Cir. 10/27/09), 28 So.3d 370, 376, this Court declined to remand the matter for imposition of the mandatory fine due to the defendant's indigent status. This Court noted that the defendant was represented by the Louisiana Appellate Project, which provides appellate services *909 for indigent criminal defendants in non-capital felony cases.
In the instant case, it appears that defendant is indigent because he is being represented by the Louisiana Appellate Project. Because defendant is indigent, we decline to remand the matter for imposition of the mandatory fine. See State v. Bennett , 10-393 (La. App. 5 Cir. 3/29/11), 63 So.3d 251, 260, writ denied , 11-0931 (La. 10/21/11), 73 So.3d 381.
Post-Conviction Relief Advisal
The transcript does not reflect that the trial judge advised defendant of the time period for seeking post-conviction relief as required by La. C.Cr.P. art. 930.8 ; however, the sentencing minute entry reflects that the trial judge advised defendant of those provisions. The transcript prevails. See State v. Lynch , 441 So.2d 732, 734 (La. 1983). Accordingly, we hereby advise defendant, by way of this opinion, that no application for post-conviction relief, including applications which seek an out-of time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. See State v. Brooks , 12-226 (La. App. 5 Cir. 10/30/12), 103 So.3d 608, 615, writ denied , 12-2478 (La. 4/19/13), 111 So.3d 1030.
Concurrent Sentences
The transcript reflects that the trial judge ordered the sentences on counts one through six to run concurrently with each other and "concurrently at the end of any other sentence Mr. Montero is serving." However, the sentencing minute entry reflects that the trial judge ordered the sentences to run concurrently "with any other sentence the Defendant may be serving," and the uniform commitment order (UCO) indicates that the sentences are to run concurrently with "any other sentence the Defendant may be serving." The transcript prevails. See Lynch, supra . Because there are inconsistencies between the sentencing minute entry, the UCO, and the transcript, we find it necessary to remand the matter to the trial court and instruct the trial judge to correct the sentencing minute entry and the UCO to conform to the transcript. The Clerk of Court for the 24th Judicial District Court is further ordered to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and to the Department of Corrections' legal department. See State v. Garcie , 17-609 (La. App. 5 Cir. 4/11/18), 242 So.3d 1279, 1290.
Dates of Offenses/UCO
The UCO indicates that the offense date in counts two through six was January 1, 2006. However, the State alleged in the amended indictment that the offenses for those counts occurred on or between January 1, 2006 and December 31, 2011. The evidence at trial was unclear as to exactly when the offenses began; however, it appears that the offenses began in 2006 or 2007 after defendant moved into the house. The evidence was clear that the offenses stopped occurring when defendant moved out of the house in 2011. As such, we remand the matter to the trial court for correction of the UCO to show that the offenses occurred on or between January 1, 2006 and December 31, 2011. The Clerk of Court for the 24th Judicial District Court is ordered to transmit the corrected UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and to the Department of Corrections' legal department. See Garcie , supra .
CONCLUSION
For the foregoing reasons, we affirm defendant's convictions and sentences.
*910 However, we remand this matter to the trial court for correction of errors patent in accordance with this opinion.
AFFIRMED; REMANDED

On April 6, 2017, the State amended count one of the indictment to reflect that defendant failed to maintain his registration as a sex offender by failing to provide his address of residence, and it amended counts three through six to reflect that the offenses occurred on or between January 1, 2006 and December 31, 2011.

The State filed three, separate "Notice of Intent to Introduce Evidence of Other and Similar Crimes" concerning (1) his prior conviction for indecent behavior with a juvenile; (2) testimony from his niece, K.H., as to prior sexual abuse by defendant; and (3) testimony from his stepdaughter, Y.M., concerning prior sexual abuse by defendant. On appeal, defendant challenges only the trial court's ruling granting the state's notice of intent as to defendant's prior conviction for indecent behavior with a juvenile.

See errors patent discussion.

The minor victims and their relatives will be referred to by their initials to protect the victims' identities. See La. R.S. 46:1844(W)(3) ; State v. Clifton , 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 695.

Detective Foltz stated that Ms. Holder told him she reported those incidents years later to law enforcement; however, he was unable to locate any reports.